UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CATHIE M. SPOLARIC,            )
                               )
            Plaintiff          )
                               )
        v.                     ) Case No. 2:06 cv 74
                               )
JO ANNE B. BARNHART,           )
Commissioner of Social Security )
                               )
            Defendant          )

OPINION AND ORDER

This matter is before the court on the plaintiff's petition for judicial review of the decision of the Commissioner of Social Security filed by the plaintiff, Cathie M. Spolaric, on June 26, 2006.  For the reasons set forth below, the decision of the Commissioner is **REVERSED AND REMANDED.**

Background

The plaintiff, Cathie M. Spolaric, applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on August 13, 2003, alleging a disability onset date of August 31, 1992.  (Tr. 334-336)  The claim was denied initially on December 4, 2003, and upon reconsideration on January 7, 2004.  (Tr. 25, 30)  Spolaric requested a hearing before an Administrative Law Judge ("ALJ") on February 24, 2004.  (Tr. 33)  A hearing was held before ALJ Paul R. Armstrong on August 23, 2005.  (Tr. 14, 376)  After the hearing, in which Spolaric and Vocational Expert ("VE") Thomas Grzesik testified, the ALJ denied Spolaric's application by written decision dated September 25, 2005.  (Tr.

14-21)  Spolaric requested review by the Appeals Council on
October 25, 2005, and the Appeals Council denied her request for
review on January 6, 2006.  (Tr. 9, 5)  Following the denial of
her request for review, Spolaric filed a complaint in this court
on June 26, 2006.

Spolaric was born on November 23, 1952 and is now 53 years
old.  (Tr. 19)  She is a high school graduate and has completed
training to become a flight attendant.  (Tr. 76)  Spolaric worked
as a house cleaner from 1988 until 2002.  (Tr. 378, 380)  This
work involved general house work such as mopping floors, cleaning
bathrooms, vacuuming, and dusting.  (Tr. 380)  Spolaric testified
at the hearing before the ALJ that she performed this work
several times per week for four or five hours at a time. (Tr.
380) However, in a report submitted to the Social Security
Administration, she claimed that she did this work only one day
per week, for four or five hours per day.  (Tr. 71)  Aside from
occasional housecleaning, Spolaric reported no other work his-
tory.  (Tr. 82)

Spolaric alleged that she became disabled on August 31,
1992.  (Tr. 70, 334)  Spolaric cited chronic fatigue, weakness
and pain in her legs and arms, neck, shoulders and back, intoler-
ance to cold and heat, headaches, lapses in short-term memory and
poor concentration.  (Tr. 70)  Spolaric began to receive treat-
ment for these symptoms in May of 2003.  (Tr. 72)

On May 30, 2003, Spolaric was examined at the St. Clair
Health Clinic, where her complaints of fatigue, muscle weakness,

arm and leg pain, insomnia, and heat and cold intolerance were noted. (Tr. 238-241, 314-315) The examining physician also noted that Spolaric was experiencing pain in her spine, that her joints were not tender, that she was able to walk heel/heel, toe/toe, and toe/heel, that she had normal push and pull strength, and that her fine and gross motor skills were intact.  (Tr. 235, 315) The examining physician also noted eight posterior pressure points, two anterior pressure points, and allergic rhinitis. (Tr. 237)  The examiner referred Spolaric for an x-ray of her spine and started her on Vioxx and Benadryl.  (Tr. 237)

On June 5, 2003, Spolaric had an x-ray taken of her lumbar spine which showed minimal degenerative changes with anterior spurring at L3-L4, minimal levoscoliosis, mild degenerative joint disease at the facet joints of L5-S1 bilaterally, and minimal cervical spondylitic changes at C5-C6 with anterior spurring. (Tr. 233-234) On the same day, Spolaric had an x-ray taken of the distal fourth finger in her right hand, which showed no evidence of any fracture or dislocation, normal bone density, and no osseous abnormalities.  (Tr. 232)

On June 13, 2003, Spolaric went to the St. Clair Health Clinic where she complained of persistent low-back pain, persistent neck-pain, and leg weakness.  (Tr. 229)  She was referred for an internal medicine consultation to be evaluated for neuro-muscular disorders, chronic fatigue syndrome, fibromyalgia, and chronic malformation. The doctor also prescribed medication for her pain.  (Tr. 229)  Spolaric continued her treatment at the St.

3

Clair Health Clinic from July through November 2003. (Tr. 220-221, 317-320) During these visits, Spolaric was treated for fibromyalgia and depression. (Tr. 317-320) On August 29, 2003, Spolaric stated that she did not feel depressed, that she ate normally and slept well, but that she had increased extremity pain. (Tr. 319)

On August 29, 2003, on a statement of medical condition for the food stamp and temporary assistance for needy families programs, a physician stated that Spolaric had chronic fatigue and fibromyalgia and that she was totally unable to work. (Tr. 216) Spolaric was interviewed telephonically by A. White of the Social Security Administration on September 25, 2003, who noted that Spolaric had difficulty answering questions, that Spolaric's voice was a bit flat, as if depressed, and that Spolaric had very little inflection in her voice. (Tr. 79-81) On October 14, 2003, in a Work History Report, Spolaric reported that she cooked only simple meals and that she had to rest before she drove. (Tr. 90-93) Spolaric stated that on good days, of which she did not have many, she could do only about 2-4 hours of work due to pain and fatigue. (Tr. 90-93)

On November 4, 2003, Spolaric was examined by consultative examiner Dr. Iqbal Singh. (Tr. 243-245) Dr. Singh reviewed her symptoms and noted no signs of fatigue. (Tr. 243) Dr. Singh also noted that Spolaric was in no acute distress, was alert and oriented, had a normal gait, was able to walk heel to toe and tandemly without difficulty, was able to stoop/squat fully, and

4

was able to get on and off the examination table without assis-
tance.  (Tr. 243) Dr. Singh reported that Spolaric had good fine
finger manipulative abilities and no sensory deficits. (Tr. 244)
Her muscle strength and tone was 5/5, grip strength bilaterally
was 5/5, and deep tendon reflexes were 2/4.  (Tr. 244) Dr.
Singh's impression of Spolaric was that she had fibromyalgia and
depression.  (Tr. 245)

On November 25, 2003, Spolaric's file was reviewed by Dr. D.
Unversaw for psychological disorders.  (Tr. 247-260) Dr. Unversaw
concluded that Spolaric had depression but that her impairment
was not severe. (Tr. 247)  Dr. Unversaw stated that depression
did not restrict her activities of daily living or cause diffi-
culty in maintaining social functioning. (Tr. 247) Spolaric
experienced no episodes of decompensation of extended duration,
but she had mild difficulty in maintaining concentration, persis-
tence, or pace.  (Tr. 247, 250, 257)  This opinion was affirmed
by Dr. W. Shipley on January 16, 2004.  (Tr. 247)

On November 26, 2003, a physical residual functional capac-
ity assessment was completed by Dr. B. Whitley and affirmed on
January 16, 2004, by Dr. J. Sands.  (Tr. 261-268)  Dr. Whitley
concluded that Spolaric occasionally could lift 50 pounds,
frequently lift and/or carry 25 pounds, stand and/or walk about 6
hours in an 8-hour workday, sit for a total of about 6 hours in
an 8-hour workday, and was unlimited in pushing and pulling.
(Tr. 262) Dr. Whitley based his conclusions on the diagnosis of
fibromyalgia, Spolaric's free range of motion in all joints upon

5

examination, normal limitations on grip and muscle strength, normal gait and station, and normal limitation on fine and gross manipulation. (Tr. 262) Dr. Whitley also concluded that Spolaric had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 263-266) In the assessment, he determined that Spolaric's contentions regarding the nature and severity of her impairment-related symptoms and corresponding functional limitations were partially credible. (Tr. 266) Dr. Whitley found that the allegations regarding the nature of the symptoms were supported within the medical and other evidence, but that Spolaric's contentions regarding the severity of the symptoms and the related functional restrictions were not supported. (Tr. 266)

On March 15, 2004, Spolaric saw Dr. Steven A. Corse for the first time, who referred her to Dr. Keith Reich. (Tr. 309) On March 19, 2004, Spolaric was examined by Dr. Reich. (Tr. 290) This examination was documented in a letter from Dr. Reich to Dr. Corse in which Dr. Reich stated that Spolaric was alert and oriented to person, place, and time and that she had significant tenderness with a number of myofascial trigger points and some fibromyalgia tender points. (Tr. 291) Spolaric's reflexes were 2/4 in the upper extremities and 4/4 in the patellar. (Tr. 291) Spolaric had weakness on resisted flexion of both hips, but Dr. Reich could not tell whether this was weakness or pain. (Tr. 291) She could stand on one foot and stand on her toes, and she could

squat and stand up again.  (Tr. 291) Dr. Reich noted Spolaric's complications from multiple medications and stated that he wanted to use a non-pharmacological approach to treatment.  (Tr. 291) Because of her hyperreflexia and weakness in her thighs, Dr. Reich ordered an MRI of her lumbar spine.  (Tr. 291)

On March 29, 2004, Spolaric underwent an MRI exam by Dr. Pankaj J. Patwari. (Tr. 300) Dr. Patwari found a slight desiccation of the intervertebral discs between the L3-L4 and L4-L5 segments without demonstrable bulging or herniation, no spinal stenosis or foraminal compromise, and no bony lesions involving the vertebral bodies or paraspinal soft tissue masses.  (Tr. 300) On April 5, 2004, Spolaric saw Dr. Corse for a follow-up, where she complained that she had "had a bad few weeks" and that she experienced hip-pain and insomnia.  (Tr. 308)  On April 6, 2004, Spolaric was reevaluated by Dr. Reich, who reviewed the MRI of Spolaric's spine and noted that the MRI was normal. (Tr. 289) Dr. Reich noted that Spolaric was feeling a little better overall and that she seemed to be in control of her situation mentally. (Tr. 289) Dr. Reich noted that Spolaric had soft-tissue rheumatism/fibromyalgia and continued her treatment with Ultram, exercise, and stretching.  (Tr. 289)

Spolaric was seen regularly by Dr. Corse through July of 2005.  (Tr. 301-309)  During these visits, Spolaric complained of pain in her arm, neck, legs, hip, and back, dizziness and confusion when walking down stairs, stress, and nose bleeds.  (Tr. 301-309)  Throughout the course of these visits, Dr. Corse

7

prescribed various medications to treat these symptoms.  (Tr. 301-309)

     On November 29, 2004, Spolaric saw Dr. Reich, who diagnosed her with soft tissue rheumatism, depression, bursitis/tendonitis in her left shoulder, and myofascial trigger points.  (Tr. 285) Dr. Reich prescribed a program of back exercise, walking, and stretching.  (Tr. 285)  On July 18, 2005, Spolaric again saw Dr. Reich and complained of drowsiness and dizziness as side-effects from her medications.  (Tr. 282-283)  Spolaric was seen in Dr. Reich's office by Kathleen Carlson on July 22, 2005. (Tr. 280) Spolaric complained of pain in her back and legs and stiffness throughout the day. (Tr. 281) She reported that she was regularly fatigued despite sleeping for 12 hours.  (Tr. 280)

     On August 2, 2005, Carlson completed a Fibromyalgia Residual Functional Capacity Questionnaire on behalf of Dr. Reich.  (Tr. 270-274)  Carlson cited the x-ray of Spolaric's lumbar spine as the clinical findings that showed Spolaric's impairment.  (Tr. 270)  Carlson noted that Spolaric occasionally could carry less than 10 pounds and that she probably would be absent from work more than four times a month.  (Tr. 273)  On August 16, 2005, Dr. Corse filled out a second Fibromyalgia Residual Functional Questionnaire in which he noted that Spolaric could not work an 8-hour day and was able to sit, stand, or walk for less than 2 hours per day.  (Tr. 275-279)  Dr. Corse also noted that Spolaric would need a job that would permit shifting positions at will from sitting, standing, or walking; would allow her to lie down

8

at unpredictable intervals during a work shift; where she would
lift less than 10 pounds occasionally, and where she would bend
and twist at the waist occasionally.  (Tr. 275-279)

During Spolaric's hearing on August 23, 2005, she testified
that she lived with her son in a two-story house with a basement.
(Tr. 385-386) Spolaric testified that she was able to do the
necessary activities of living such as cleaning, cooking, laun-
dry, housecleaning, and grocery shopping but that she required
assistance from her son.  (Tr. 386-387)  Spolaric testified that
she used to mow the lawn until 2003, but now her son did that for
her.  (Tr. 401)  She testified that she did not make big dinners
anymore, but that she tried to prepare meals that were quick and
easy.  (Tr. 386)  Spolaric testified that she used to run approx-
imately three miles each day but the distance gradually decreased
to one mile, and then to alternating walking and jogging. How-
ever, in 2002, she found she "just couldn't do it anymore" due to
the pain.  (Tr. 387)   Spolaric also testified that she no longer
was able to lift very much and stated that she must use two hands
when lifting a full two-liter bottle of pop.  (Tr. 388)

Spolaric testified that she never had talked to a psycholo-
gist or a therapist.  (Tr. 389)  She said that she had been
taking antidepressants, but they were not helping.  (Tr. 389)
Spolaric testified that she had seen Dr. Reich about four times
at the time of the ALJ hearing and that these were short visits
to regulate her medications.  (Tr. 389)  At the hearing, the ALJ
also noticed that Spolaric experienced discomfort in her neck or

9

shoulder. (Tr. 389) Spolaric responded that she was experiencing pain from her drive to the hearing. (Tr. 389)

The ALJ inquired into Dr. Corse's diagnosis of Spolaric's sleep disorder and restless leg syndrome, and Spolaric testified that she had described these to Dr. Corse. (Tr. 390-391) Spolaric also testified that she could not handle stress, for example driving on congested highways created stress that caused a lot of pain in her neck. (Tr. 391) Spolaric also testified that she had a generalized aching and that she would get sharp pains very suddenly. (Tr. 392-393) She testified that she would get swelling, especially in her hands, and that she had numbness and tingling. (Tr. 393-395) Spolaric also testified that she became dizzy if she was up for too long and did not rest. (Tr. 398) She testified that she was relatively healthy until the onset of her symptoms and waited a year and a half before seeking treatment because she thought they would pass. (Tr. 399)

Following Spolaric's testimony, the ALJ asked Vocational Expert ("VE") Thomas Grzesik to describe the jobs available for an individual with no relevant work history who was limited to light exertional duties with no overhead work with a left non-dominant arm, and who could not work at unprotected heights, around dangerous moving machinery, open flames, or bodies of water. (Tr. 402) VE Grzesik testified that there would be 4,000 order clerk jobs, 3,500 cashier jobs and 4,000 information clerk jobs available in the region. (Tr. 402-403) In his second hypothetical question, the ALJ asked the effect if the person

10

were limited to lifting no more than 10 pounds.  (Tr. 403)  VE
Grzesik testified that this limitation still allowed for light
jobs that included 3,500 hand packer jobs, 4,000 mechanical
assembler jobs and 3,500 electrical assembler jobs. (Tr. 403)  On
cross-examination by counsel for Spolaric, Grzesik testified that
it would be a bad idea for an individual who has a tendency to be
clumsy to be handling a pot of coffee in a hostess job.  (Tr.
403) He also testified that an individual was not suitable for
employment as a hand packer if the individual could not stay on
task for over 15 minutes out of an hour.  (Tr. 404) Finally,
Grzesik testified that if an individual had problems keeping
pace or dealing with stress which caused her production to be
hampered, this would preclude a job as a hand packer.  (Tr. 405)

     In his decision, ALJ Armstrong stated that Spolaric had an
impairment that was severe within the meaning of the Regulations
but did not meet a listing impairment. (Tr. 17)  The ALJ consid-
ered Listing 12.04 which refers to an affective disorder, but he
noted that Spolaric did not meet the requirements under this
Listing because she did not exhibit marked restrictions in her
activities of daily living, difficulty maintaining social func-
tioning, or episodes of decompensation.  (Tr.17)  The ALJ made
this determination after considering Spolaric's complaints of
symptoms, a March 19, 2004 examination by Dr. Reich, a March 29,
2004 MRI examination of Spolaric's lumbar spine, the April 6,
2005 progress notes by Dr. Reich, and an August 16, 2005 residual
functional questionnaire by Dr. Corse.  (Tr. 16-17)  The ALJ

noted that Dr. Reich indicated that Spolaric was feeling better
and handling the situation better and that Dr. Reich did not
alter Spolaric's treatment with medication, exercise, and
stretching.  (Tr. 16)

The ALJ concluded that Spolaric's description of her symp-
toms and limitations throughout the record were inconsistent and
unpersuasive.  (Tr. 17)  Specifically, the ALJ noted that the
medical evidence supported the nature of Spolaric's symptoms but
not the severity of related functional restrictions.  (Tr. 17)
The ALJ cited the examinations of Spolaric by Dr. Singh and Dr.
Reich in which Spolaric was able to walk, get on and off the
examination table, and squat and stand up again without diffi-
culty.  (Tr. 17)  The ALJ also cited the MRI of Spolaric's lumbar
spine which revealed no abnormal findings.  (Tr. 17) The ALJ
further cited Spolaric's report of daily activities dated October
22, 2003 in which she reported she could cook simple meals, drive
a car, do some gardening with assistance, and was able to go
shopping with her son.  (Tr. 18)  He concluded that Spolaric's
daily activities "are not limited to the extent one would expect,
given her complaints of disabling symptoms and limitations."
(Tr. 18) In considering the fibromyalgia residual functional
capacity questionnaires completed by Carlson and Dr. Corse, the
ALJ found "absolutely no support for these opinions in the
objective findings in the record, particularly the rather
detailed physical examination of Dr. Reich from April 6, 2004 and
normal MRI of [Spolaric's] spine."  (Tr. 18)

12

The ALJ concluded that Spolaric had an RFC for light
exertional work with no overhead work with her left arm and no
work at unprotected heights, around dangerous moving machinery,
open flames, or bodies of water.  (Tr. 18)  The ALJ found that
Spolaric could perform 3,500 cashier jobs, 3,500 order clerk
jobs, 3,500 information clerk jobs, 3,000 mechanical assembler
jobs and 3,500 electrical assembler jobs.  (Tr. 19)

### Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-
rity Act is limited to a determination of whether those findings
are supported by substantial evidence.  42 U.S.C. §405(g) ("The
findings of the Commissioner of Social Security, as to any fact,
if supported by substantial evidence, shall be conclusive.");
*Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003);
*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Sub-
stantial evidence has been defined as "such relevant evidence as
a reasonable mind might accept to support such a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28
L.Ed.2d 852 (1972) (*quoting* *Consolidated Edison Company v. NLRB,*
305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).
*See also* *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002);
*Green v. Shalala,* 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's
decision must be affirmed if the findings are supported by
substantial evidence and if there have been no errors of law.
*Golembiewski*, 322 F.3d at 915; *Cannon v. Apfel,* 213 F.3d 970, 974

13

(7th Cir. 2000).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §§404.1520, 416.920.  The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §§404.1520(b), 416.920(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. §§404.1520(c),  416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does, then the impairment is acknowledged by the

Commissioner to be conclusively disabling.  However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work.  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §§404.1520(e), 416.920(e).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §§404.1520(f), 416.920(f).

Spolaric contends that the ALJ did not fulfill the procedural steps of a credibility determination set forth in SSA 96-7p and 20 C.F.R. §404.1529.  In support, she argues that the ALJ erroneously evaluated her fibromyalgia impairment, improperly rejected evidence of the effect her symptoms have on her activities, and ignored evidence of the side-effects of her medication.

This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  The ALJ's "unique position to observe a witness" entitles his opinion to great deference.  *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).

15

However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. **Steele v. Barnhart**, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." **Clifford v. Apfel**, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c).

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." SSR 96-7p, at *1. *See also* **Indoranto v.**

16

*Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barn-***

***hart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling,

the fact that its source is purely psychological does not disen-

title the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claiming. She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties. Factors that must be
> considered include the nature and intensity
> of the claimant's pain, precipitation and
> aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities. (internal
> citations omitted).
>
> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir.
> 1994)

*See also* ***Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir.

2001).

In addition, when the ALJ discounts the claimant's descrip-

tion of pain because it is inconsistent with the objective

medical evidence, he must make more than "a single, conclusory

statement . . . . The determination or decision must contain

specific reasons for the finding on credibility, supported by the

evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and

the reasons for that weight." SSR 96-7p, at *2. *See* ***Zurawski***,

17

245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).  He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872. When the evidence conflicts regarding the extent of the claim- ant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting.  *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986))("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

Furthermore, the ability to perform minimal daily activities does not undermine a claim of disabling pain.  *Clifford*, 227 F.3d at 872.  The Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).  A failure to consider  the difference between a person's ability to engage in sporadic physical activities and being able to work eight hours per day for five consecutive days per week can render an ALJ's credibility determination illogical. *Carradine*, 360 F.3d at 755 ("[The ALJ] failed to consider the difference between a person's being able to engage in sporadic

18

physical activities and her being able to work eight hours a day five consecutive days of the week.").

The ALJ's opinion describes Spolaric's testimony regarding the severity of her impairment as partially credible. (Tr. 17) Specifically, the ALJ found that the medical and other evidence is supportive of the *nature* of Spolaric's symptoms, but that the *severity* of Spolaric's related functional restrictions is not supported. (Tr. 17)   The court presumes that by this statement, the ALJ has concluded that Spolaric indeed suffers from, among other ailments, fibromyalgia, but not to the extent that she claims.

In discounting the severity of the functional restrictions related to Spolaric's symptoms, the ALJ noted that Spolaric "has described daily activities which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." (Tr. 18)  The ALJ provides very little explanation or reference to the record to support his conclusion that Spolaric's testimony is inconsistent with the remaining evidence. Under the guise of finding Spolaric "partially credible," the ALJ appears to have selectively discounted only that testimony which conflicts with his conclusion. The ALJ did not address Spolaric's testimony regarding the frequency of her household activities, nor did the ALJ address the fact that the effect of her symptoms on her functional restrictions appears to have become worse over time. The ALJ's conclusion that Spolaric regularly engaged in household activities was made without reference to Spolaric's

19

testimony that she no longer could do yard-work.  (Tr. 401)
Spolaric also testified that she was not able to clean her house
on a regular basis, but rather she was able to clean one room at
a time if she "[had] a good day."  (TR. 386-387)  Spolaric also
testified that she no longer was able to walk a mile and that
when she did walk, she experienced pain that forced her to rest.
(Tr. 388)  She testified that she had difficulty lifting items
such as a gallon of milk or a 10-pound bag of potatoes.  (Tr.
388)  Spolaric testified that instead, she bought potatoes
individually, "usually three, four at a time" and that she bought
milk in quarter-gallon containers.  (Tr. 388)

In addition to discounting testimony without explanation,
the ALJ based his conclusion on a similarly selective view of the
evidence of record. The ALJ relied almost exclusively on the
daily activities report from October 2003 to discount Spolaric's
testimony and to conclude that Spolaric regularly engaged in
significant household activity. The ALJ noted that Spolaric
reported cooking and driving with some regularity, but he failed
to note that Spolaric also stated that she only drove when she
took her son to school or to go to the grocery store.  (Tr. 90)
The ALJ also failed to note that Spolaric no longer did her
gardening and weeding and that she required assistance when she
went grocery shopping.  (Tr. 90)  Spolaric's report of daily
activity is consistent with her testimony before the ALJ. Spola-
ric testified that while she was able to do some of these activi-
ties, such as driving, she also was required to rest before and

20

after because of pain and fatigue.  (Tr. 90-93) The ALJ provides
no rationale to support this selective approach to Spolaric's
testimony and his conclusion that the evidence is somehow "incon-
sistent and unpersuasive."

On remand, the ALJ should conduct a more focused inquiry
into Spolaric's daily activities to determine the extent of her
pain and the extent of her ability to perform tasks that would be
comparable to sustaining such activity in a normal work environ-
ment. *See Zurawski*, 245 F.3d at  887 ("If the allegation of pain
is not supported by the objective medical evidence in the file
and the claimant indicates that pain is a significant factor of
his or her alleged inability to work, then the ALJ must obtain
detailed descriptions of claimant's daily activities by directing
specific inquiries about the pain and its effects to the claim-
ant.").

The ALJ also rejects the fibromyalgia RFCs because these
opinions "seem to be based upon the claimant's own complaints."
(Tr. 18) Though the commissioner supplies a variety of arguments
in support of the ALJ's decision, the ALJ offers virtually
nothing more to support neglecting these RFCs. *See Banks v.
Gonzales*, 453 F.3d 449, 451 (7th Cir. 2006)("We must remand - for
judges cannot resolve administrative litigation on grounds the
agency ignored."). Considering the nature of fibromyalgia and the
evidence in the record supporting Spolaric's diagnosis, the ALJ
may not discount such evidence with no better rationale than the
fact that it is based upon the claimant's subjective complaints.

21

As the Seventh Circuit has made clear, fibromyalgia is primarily diagnosed according to subjective criteria. The ALJ may not discount evidence of an entirely subjective disease on the basis that the record contains only subjective information.  *See* *Sarchet v. Chater* 78 F.3d 305, 306 (C.A.7 Ill. 1996) ("[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia.").

Accordingly, because of the flaws in the ALJ's analysis, this court cannot determine whether the ALJ's credibility determination can be upheld.  At a minimum, the ALJ must consider the sporadic nature of Spolaric's daily activities when determining her credibility as to the extent of her limitations.  On remand, the ALJ must reevaluate Spolaric's complaints of pain, with an accurate account of Spolaric's daily activities, the frequency of her "good days," and an analysis of the way in which her daily activities have become more restricted since she completed the daily activities reports in 2003.

Spolaric also argues that the ALJ failed to consider information about side-effects from her medication.  Spolaric claims to have side-effects from medications such as drowsiness, dizziness, shortness of breath, constipation, insomnia, dry mouth, and nausea.  (Tr. 75, 215, 283, 290, 291, 390) However, she has not developed an argument that shows the ALJ's failure to consider these side-effects would alter his analysis of the her credibil-

22

ity or residual functional capacity.  Moreover, there is evidence in the record that indicates that the ALJ did consider the claimant's side-effects in determining her credibility, when formulating her residual functional capacity, and in the hypotheticals posed to the VE.  (Tr. 390, 404) Accordingly, this court finds that there is substantial evidence that the ALJ did consider the claimant's side-effects to her medications

Spolaric's final argument in support of reversal or remand is that the ALJ failed to account for her age and education level in the hypothetical question posed to the vocational expert. Generally, a hypothetical question must include *all* limitations supported by medical evidence in the record.  *Steele*, 290 F.3d at 942 (emphasis in original).  The reason for this rule is so that the vocational expert "does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations."  *Steele*, 290 F.3d at 942.  Consequently, an exception to this rule exists when the "vocational expert independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them." *Steele*, 290 F.3d at 942.  For this exception to apply, the vocational expert must have reviewed the claimant's medical evidence or been present during the claimant's administrative hearing testimony.  *Ragsdale v. Shalala*, 53 F.3d 816, 818 (7th Cir. 1995).

The hypothetical question and subsequent follow-up questions posed to the vocational expert did not include the claimant's age or education level in their list of limitations.  (Tr. 402-405) However, the vocational expert was present during the claimant's testimony at the administrative hearing.  (Tr. 376) Additionally, the record indicates that the vocational expert reviewed the claimant's medical evidence.  (Tr. 42-43)  Accordingly, the hypothetical question posed to the vocational expert does meet the exception as set forth in ***Steele*** and ***Ragsdale***.

————————————

For the foregoing reasons, the decision of the Commissioner is **REVERSED AND REMANDED** pursuant to sentence four of 42 U.S.C. §405(g). On remand, the ALJ is directed to reevaluate Spolaric's claim consistent with this opinion.

ENTERED this 20th day of November, 2006

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge

24